IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


SCHECHINGER V. SWAIN CONSTRUCTION


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


DANIEL SCHECHINGER, APPELLEE,

V.

SWAIN CONSTRUCTION, INC., APPELLANT.


Filed August 11, 2020.    No. A-19-689.


Appeal from the District Court for Douglas County, MARLON A. POLK, Judge, on appeal thereto from the County Court for Douglas County, CRAIG Q. MCDERMOTT, Judge. Judgment of District Court affirmed.

Damien J. Wright and Natalie M. Hein, of Welch Law Firm, P.C., for appellant.

Daniel Schechinger, pro se.


MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

BISHOP, Judge.

## INTRODUCTION

After Daniel Schechinger bought a skid loader from Swain Construction, Inc. (Swain), he filed a claim against the corporation and its principal, Greg Armstrong, alleging misrepresentation of the actual hours that the machine had been in use. The county court for Douglas County, sitting as a small claims court, entered a judgment of $2,686, plus interest and costs, in Schechinger's favor against Swain. Armstrong was personally dismissed from the case. On Swain's appeal to the Douglas County District Court, the order of the small claims court was affirmed. Swain now appeals to this court, contending that a disclaimer in the terms of sale precluded reliance on any parol evidence and that the calculation of damages was incorrect. We affirm.


- 1 -

BACKGROUND

Swain is a corporation with a place of business in Omaha, Nebraska. For several years, Swain owned a particular "2003 Case 90XT" skid loader, and sometime before or around February 2019, Swain listed it for sale on a website as part of an online auction. Armstrong indicated that the terms for the sale provided that the skid loader was to be sold "'as is.'" Schechinger did not dispute that. The description for the skid loader included that it had "206 Hrs Showing."

Schechinger, a farmer, and his son saw the skid loader and its description on the auction website. They noted the description that said "206 hours." Schechinger's son said that on February 2, 2019, he telephoned Swain and asked one of its employees, "'Can those hours actually be true?'" The employee responded affirmatively and added, "'We didn't use it.'" Regarding the call, Schechinger said the employee was "just sure that [the skid loader] had 206 hours." The rest of Schechinger's dealings with Swain were through that same employee.

On February 6, 2019, Schechinger and his son went to Swain's place of business and test drove the skid loader in the presence of Swain's employee. Schechinger implied the test drive was limited due to it being "rough to drive." His son remembered that the employee had said the following about the skid loader: "'This thing's got 206 hours on it. We never use it. It's been sitting back here since I've worked here for seven or eight years and we rarely move it.'" Schechinger and his son both said they questioned the appearance of the skid loader. Schechinger's son believed it did not look like a 200-hour machine, especially considering its "bucket"; the employee had relayed that the bucket was "'probably from a different machine.'" Schechinger remembered that when he asked about the skid loader's appearance, the employee answered that it "sat around a lot, because it had some odd tires on it." Schechinger said he asked about the skid loader's bucket; the employee indicated that the bucket was not the original but was "brand new" and acquired from a transaction made "a while back." Schechinger's son said they were reassured "several times" that the skid loader was a 206-hour machine. Schechinger recalled that the employee was "sure" that the skid loader "sat back there and only had 206 hours."

The next day, on February 7, 2019, Schechinger was the successful bidder of the skid loader for a total of $18,551. On February 9, he went to pick up the skid loader from Swain. During that time, Swain's employee gave Schechinger the service records for the skid loader. According to Schechinger, the employee told him that he did not have to service the skid loader (right away) because it "'only'" had "'188 hours on it.'" The first page of the service records shows the most recent entry regarding service performed was in April 2014, when it reflected 188 hours of use.

After Schechinger left Swain, he noticed a second page in the service records which revealed more hours of use on the skid loader than he was told it had. Schechinger returned to Swain at some point and showed the employee what he had discovered. Schechinger said that the employee responded saying he must had given Schechinger the "'wrong file.'" But Schechinger had pointed out that the service records he had matched his skid loader; the invoice for the sale and service records given to Schechinger both refer to a skid loader of the same serial number. The employee then said he had told "'everybody'" that the skid loader only had "'206 hours on there.'"

The second page of service records shows service performed dating back to 2004. When the skid loader was serviced on April 26, 2010, it had 1,343 hours on its hour meter. However, on

- 2 -

May 17, the skid loader's hour meter read "000" after its "instrument cluster" was replaced that day. From that point until April 2014, the number of hours on the hour meter steadily increased to the last entry on the service records of 188 hours.

Armstrong confirmed that Swain's employee's communications with Schechinger happened before the purchase occurred. Armstrong thought that the employee made a "simple mistake" in saying that the skid loader "had 206 hours" from looking at the front page of the service records. The employee did not realize there was a second page but "probably -- maybe" should have looked at it. Armstrong asserted that the description of the skid loader was in regard to how many hours were "showing" rather than the "actual" hours which the skid loader had been in use. However, Schechinger testified that Swain's employee told him and his son over the cell phone that "it was actual hours." Schechinger felt that if he had known the amount of hours on the skid loader, he would not have been interested in it. If he would not have been reassured "so many times," that the skid loader had 206 hours on it despite its condition, Schechinger would not have placed a bid for it. He believed that each additional hour that the loader had been used, beyond 206 hours, devalued the skid loader by $2.

On February 20, 2019, Schechinger commenced this action in the small claims court against Swain and Armstrong, alleging that the defendants "misrepresented" the amount of hours on the skid loader. Schechinger claimed that he was assured that the hour meter on the machine he purchased showing 206 hours was correct, but that the service records he received upon picking up the machine indicated "1,550+ hours." He sought a judgment in his favor in the sum of $3,000, plus costs. An evidentiary hearing took place on March 13. Later that same day, the small claims court entered a judgment in favor of Schechinger against Swain in the amount of $2,686, plus interest and costs. Armstrong, in his personal capacity, was dismissed from the case with prejudice. On April 10, Swain appealed the judgment to the district court.

A hearing before the district court took place on June 18, 2019, at which Schechinger appeared pro se and Swain appeared with counsel. The bill of exceptions of the hearing in the small claims court was received in evidence. After hearing argument from each party, the district court took the matter under advisement. The next day, the district court issued an order in which it found that based on its review of the record the decision of the small claims court conformed to law and was supported by competent evidence. Therefore, the district court affirmed the judgment of the small claims court.

Swain timely appeals from the order of the district court.

## ASSIGNMENTS OF ERROR

Swain claims that the small claims court erred (1) by failing to conclude that the "as is" terms of the sale precluded reliance on parol evidence of statements made prior to the sale and (2) in its calculation of damages.

## STANDARD OF REVIEW

The district court and higher appellate courts generally review judgments from a small claims court for error appearing on the record. See, Neb. Rev. Stat. §§ 25-2733 and 25-2807 (Reissue 2016); *Hara v. Reichert*, 287 Neb. 577, 843 N.W.2d 812 (2014). When reviewing a

judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *First Nat. Bank of Unadilla v. Betts*, 275 Neb. 665, 748 N.W.2d 76 (2008). However, in instances when an appellate court is required to review cases for error appearing on the record, questions of law are nonetheless reviewed de novo on the record. *Id.*

In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict, which an appellate court will not disturb on appeal unless clearly wrong. And an appellate court does not reweigh the evidence but considers the judgment in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party. *Griffith v. Drew's LLC*, 290 Neb. 508, 860 N.W.2d 749 (2015).

## ANALYSIS

### PAROL EVIDENCE

Swain claims that the disclaimer in the terms of the sale selling the skid loader "as is" should have been found to preclude reliance on parol evidence of statements made before the sale. Swain argues that under the facts of this case, the disclaimer is controlling and Schechinger cannot assert a claim under the sale contract based on "pre-sale statements" made by Swain's employee. Brief for appellant at 9. Swain argues that due to the disclaimer, Schechinger bore the "risk of mistake" as to the skid loader's hour meter and could have readily reviewed the service records prior to the sale to satisfy himself on that matter. *Id.* Swain also argues that Schechinger has no remedy in tort either, contending that there was no evidence that its employee intended to deceive Schechinger. Swain disputes the existence of any intentional fraud under the evidence presented in this case, saying that its employee was "simply mistaken in his belief that the hours shown on the meter were accurate." *Id.* at 12.

Historically, a warranty is an undertaking or assertion by the seller that the thing sold is as represented. *Wilke v. Woodhouse Ford*, 278 Neb. 800, 774 N.W.2d 370 (2009). Under the Nebraska Uniform Commercial Code (U.C.C.), warranties related to goods sold can be either express or implied. Neb. U.C.C. §§ 2-313 through 2-315 (Reissue 2001). "[U]nless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is' . . . or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty." Neb. U.C.C. § 2-316(3)(a) (Reissue 2001).

Where a contract, after preliminary negotiations and oral conversations, is reduced to writing that is clear and unambiguous, there is a conclusive presumption that the parties have reduced their entire engagement to writing, and that any parol agreement is merged in the written contract, and that testimony of prior or contemporaneous conversations to alter, contradict, or explain such writing is incompetent to vary the terms of the written instrument. See *Donahoo v. Home of the Good Shepherd of Omaha, Inc.*, 193 Neb. 586, 228 N.W.2d 287 (1975). Stated more succinctly, the parol evidence rule renders ineffective proof of a prior or contemporaneous oral agreement which alters, varies, or contradicts the terms of a written agreement. *Sack Bros. v. Tri-Valley Co-op*, 260 Neb. 312, 616 N.W.2d 786 (2000). Unless a contract is ambiguous, parol evidence cannot be used to vary its terms. *Id.*

- 4 -

Notwithstanding the foregoing, parol evidence is generally admissible when it is offered for the purpose of explaining and showing the true nature of the transaction between the parties. See *Olds v. Jamison*, 195 Neb. 388, 238 N.W.2d 459 (1976). The parol evidence rule is ordinarily applied only in the absence of fraud, mistake, or ambiguity. *Id.* A written instrument is open to explanation by parol evidence when its terms are susceptible to two constructions or where the language employed is vague or ambiguous. *Id*. As stated in 3 A. Corbin, Corbin on Contracts § 573 at 358-60 (1960) (statement referred to with approval, or quoted in, *Olds v. Jamison, supra*, and *Central Constr. Co. v. Osbahr,* 186 Neb. 1, 180 N.W.2d 139 (1970)):

> The use of such a name [the parol evidence rule] for this rule has had unfortunate consequences, principally by distracting the attention from the real issues that are involved. These issues may be any one or more of the following: (1) Have the parties made a contract? (2) Is that contract void or voidable because of illegality, fraud, mistake, or any other reason? (3) Did the parties assent to a particular writing as the complete and accurate "integration" of that contract?
>
> In determining these issues, or any one of them, there is no "parol evidence rule" to be applied. On these issues, no relevant evidence, whether parol or otherwise, is excluded. No written document is sufficient, standing alone, to determine any one of them, however long and detailed it may be, however formal, and however many may be the seals and signatures and assertions. No one of these issues can be determined by mere inspection of the written document.

See, also, *Johnson v. Stover*, 218 Neb. 250, 354 N.W.2d 142 (1984) (relying on same authority).

The U.C.C. does not preclude an action for fraud or misrepresentation. See Neb. U.C.C. § 1-103(b) (Cum. Supp. 2018) (unless displaced by particular provisions of U.C.C., the principles of law and equity, including law merchant and law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause supplement U.C.C. provisions). It is well established that parol evidence is always admissible to show, for the purpose of invalidating a written instrument, that its execution was procured by fraud, or that, by reason of fraud, it does not express the true intentions of the parties. See *Central Constr. Co. v. Osbahr, supra.*

Before addressing the specifics of Swain's argument, it is useful to point out that the small claims court did not include in its order entering the judgment in Schechinger's favor or otherwise state on the record any factual finding or analysis underpinning its final decision. Similarly, the district court did not include in its order of affirmance any factual findings or a discussion of how the governing law applied to the facts of this case. The district court summarily stated that based on its review of the record, the judgment conformed to the law and was supported by competent evidence. The district court did not state on the record the basis on which it found that the judgment should be affirmed. Nevertheless, we can infer from its judgment in Schechinger's favor that the small claims court relied on parol evidence to some extent in reaching its decision. The inquiry before us is whether reliance on parol evidence under the circumstances of this case conforms to the law and is supported by competent evidence.

If the contract itself governing the sale of the skid loader between Schechinger and Swain was ambiguous, then consideration of and reliance upon parol evidence would have been appropriate. See *Sack Bros. v. Tri-Valley Co-op, supra* (if contract is ambiguous, parol evidence can be used to vary its terms). No contract was offered or received in evidence here; we thus consider any terms contained in the invoice for sale. We note that the description of the skid loader, including that it had "206 Hrs Showing," was reflected on Schechinger's invoice for the sale. Our understanding of the terms for the sale of the skid loader is limited solely to Armstrong's testimony indicating that the terms provided that the skid loader was to be sold "'as is.'" Schechinger did not dispute that evidence. In interpreting a contract, a court must first determine, as a matter of law, whether the contract is ambiguous. *Id.* A determination as to whether ambiguity exists in a contract is to be made on an objective basis, not by the subjective contentions of the parties; thus, the fact that the parties have suggested opposite meanings of a disputed instrument does not necessarily compel the conclusion that the instrument is ambiguous. *Id.*

Section 2-316(3)(a) expressly mandates that, unless the circumstances indicate otherwise, the use of the expression "as is" is language that in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty. Without yet considering any other circumstances other than the invoice itself, we find that the undisputed language in the terms for the sale at issue providing that the skid loader was to be sold "as is" had an unambiguous meaning. Under the U.C.C., the language was an effective disclaimer regarding the skid loader's hour meter or actual hours of use. See § 2-316(3)(a). Because the record does not show that the written terms for the sale of the skid loader were ambiguous, we cannot find on this record that the invoice itself would have permitted reliance on parol evidence to vary its "as is" term. See *Sack Bros. v. Tri-Valley Co-op, supra*. Therefore, the small claims court could not have relied on parol evidence under that basis.

The remaining question is whether parol evidence could have been relied upon by the small claims court for the reason that the transaction was the result of fraud. As stated previously, parol evidence is always admissible to show, for the purpose of invalidating a written instrument, that its execution was procured by fraud, or that, by reason of fraud, it does not express the true intentions of the parties. See *Central Constr. Co. v. Osbahr, supra*. Schechinger's claim, as set forth in his initial filing, was not a breach of contract claim but one essentially asserting that the sale was procured by fraudulent misrepresentation. A purchaser is not limited to the contract when bringing claims against the seller, but may also bring a claim for fraudulent misrepresentation. See *Gibb v. Citicorp Mortgage, Inc.*, 246 Neb. 355, 518 N.W.2d 910 (1994). An "'as is'" clause does not necessarily bar a purchaser's fraud-based claim. *Id*. at 364, 518 N.W.2d at 918.

To state a claim for fraudulent misrepresentation, a plaintiff must allege (1) that a representation was made; (2) that the representation was false; (3) that when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) that the representation was made with the intention that the plaintiff should rely on it; (5) that the plaintiff did so rely on it; and (6) that the plaintiff suffered damage as a result. *Knights of Columbus Council 3152 v. KFS BD, Inc.*, 280 Neb. 904, 791 N.W.2d 317 (2010).

Mere silence cannot constitute a misrepresentation absent a duty to disclose information. See *id.* No consideration of whether a defendant owed fiduciary duties to a plaintiff is necessary

in a case in which fraudulent misrepresentation is due to a half-truth. *Id.* When a party makes a partial or fragmentary statement that is materially misleading because of the party's failure to state additional or qualifying facts, the statement is fraudulent. *Id.* Fraudulent misrepresentations may consist of half-truths calculated to deceive, and a representation literally true is fraudulent if used to create an impression substantially false. See *id*. To reveal some information on a subject triggers the duty to reveal all known material facts. *Id.* An ambiguous statement is fraudulent if made with the intent that it be understood in its false sense or with reckless disregard as to how it will be understood. *Id.* See, also, Restatement (Second) of Torts § 526, comment e. (1977) (fraud is proved if it is shown that false representation has been made without belief in its truth or recklessly, careless of whether it is true or false). Fraud generally must relate to a present or preexisting fact and may be proved by inferences which may reasonably be drawn from intrinsic evidence respecting the transaction itself, such as inadequacy of consideration, or extrinsic circumstances surrounding the transaction. See *Central Constr. Co. v. Osbahr, supra*.

According to Schechinger's testimony, Swain's employee represented that the skid loader had 206 actual hours of use. Schechinger and his son both said they questioned the appearance of the skid loader on the day of the test drive at Swain's place of business. Schechinger's son recalled that the employee said the following about the skid loader: "'This thing's got 206 hours on it. We never use it. It's been sitting back here since I've worked here for seven or eight years and we rarely move it.'" Schechinger and his son were reassured "several times" that the skid loader was a 206-hour machine. Schechinger recalled that the employee was "sure" that the skid loader "sat back there and only had 206 hours." When Schechinger test drove the skid loader, he presumably would have been able to see the hours displayed on its hour meter. His evidence shows that he was interested to know if the displayed hours on the hour meter were actually true given the skid loader's visible condition. The employee's reassurances with references to how sparingly the machine had been used continued to communicate the representation that its hours of use were actually 206 hours. That representation was later shown by the service records to be false.

The record reflects that the employee should have known from dealing with Schechinger and his son for this transaction that they were concerned with the skid loader's actual hours of use, not merely the hours shown on the hour meter. The employee's statements about the skid loader having only "'206 hours on it'" were materially misleading to the extent that they were meant to be constrained to the hours showing on the hour meter at the time of the test drive. Because the employee's statements did not include a qualifier to that effect, they could have reasonably created a substantially false impression in Schechinger's mind that the skid loader had 206 hours of actual use. A finder of fact could also reasonably deduce from the same that Swain's employee made the false representation at least in a reckless manner as to how it would be understood. Even if the employee did not have personal knowledge of the actual hours of use of the skid loader, the employee's answers were nevertheless given as positive assertions that he did have such knowledge. Given the presale context in which the representation was made, a finder of fact could reasonably conclude that the employee intended that Schechinger rely on the representation and bid on the skid loader during the upcoming online auction.

Schechinger must have also justifiably relied on the false representation to have a viable claim for fraudulent misrepresentation. In a fraudulent misrepresentation case, whether the

plaintiff exercised ordinary prudence is relevant to whether the plaintiff justifiably relied on the misrepresentation when the means of discovering the truth was in the plaintiff's hands. See *Lucky 7 v. THT Realty*, 278 Neb. 997, 775 N.W.2d 671 (2009). A plaintiff is justified in relying upon a positive statement of fact if an investigation would be required to discover the truth; but the Nebraska Supreme Court has never held that an investigation includes an inspection of the property. *Id.* The Nebraska Supreme Court has rejected misrepresentation claims when the truth of the property's condition was obviously apparent to a potential buyer upon inspection. *Id.* In other cases, it has concluded that the buyer reasonably relied on a seller's misrepresentation only after concluding that an inspection could have been fruitless or that the seller interfered with the buyer's ability to inspect. *Id.* But in another case, a buyer's reliance on a seller's statements was reasonable when the buyer would not have discovered the needed information by inspection of the property. *Id.* See, also, *Cao v. Nguyen*, 258 Neb. 1027, 607 N.W.2d 528 (2000) (buyer's reliance on sellers' misrepresentations that property was duplex rentable to two families was reasonable when buyers would have had to contact city, research public records, and compare building code to actual home structure to prove representations were false); *Foxley Cattle Co. v. Bank of Mead*, 196 Neb. 1, 241 N.W.2d 495 (1976) (generally, fraud may be predicated on false representations although truth could have been ascertained by examination of public records).

Justifiable reliance must be decided on a case-by-case basis. See *Lucky 7 v. THT Realty, supra*. In determining whether an individual reasonably relied on a misrepresentation, courts consider the totality of the circumstances, including the nature of the transaction; the form and materiality of the representation; the relationship of the parties; the respective intelligence, experience, age, and mental and physical condition of the parties; and their respective knowledge and means of knowledge. *Id.* A clause that an article is taken in the condition in which it is, or in other words, "as is," is relevant in determining whether a claimant relied on a false representation concerning the condition of the article, but it is not controlling. See *Gibb v. Citicorp Mortgage, Inc., supra*.

As a farmer, Schechinger understood from buying "tractors, or combines, or anything," that the value of that machinery was due in part to "more hours" equating to "less value." Swain had owned the skid loader in question for years; its employee worked there for at least 7 or 8 years at the time of talking with Schechinger about the skid loader. Armstrong described the employee as Swain's "contact person." Schechinger and Swain and its employee all appear to have had experience in buying or selling farm machinery. The skid loader being sold "as is" has little to no relevance to whether Schechinger justifiably relied on the false representation that it had 206 actual hours of use, because there was no proof that the condition of the skid loader or its hour meter would have revealed the falsity. In fact, Armstrong said that "206 hours" was "what was on the hour meter" so that "all" of Swain's "shop people knew -- [including the employee who dealt with Schechinger] . . . what was on the hour meter." There was nothing showing that Schechinger could know from an inspection of the skid loader that its hour meter had been replaced before so as to indicate that the actual hours of use were higher than suggested.

Swain argues that Schechinger had the burden to request the service records prior to the sale. But the standard imposed by law is only one of ordinary prudence, and a buyer's reliance on a seller's statements may be reasonable when the buyer would not have discovered the needed

information by inspection of the property. See, *Lucky 7 v. THT Realty, supra*; *Cao v. Nguyen, supra*. Our record indicates that the service records were in Swain's possession prior to the sale. Schechinger's son testified that on the day of the test drive at Swain's place of business, Swain's employee said "the service records were across the road." It might have been prudent for Schechinger to ask to see the service records at that time. Nevertheless, we cannot say that ordinary prudence absolutely required such a request when there was also evidence that the employee came across as confident about the information he provided. For example, Schechinger had the sense that the employee was "sure" that the skid loader "only had 206 hours" and according to Schechinger's son they were "reassured several times" that it was a 206-hour machine.

Schechinger first saw the service records after the sale at the time he went to Swain's place of business to pick up the skid loader. The service records were not equally accessible to both parties in that they were in Swain's "hands." See *Lucky 7 v. THT Realty*, 278 Neb. at 1003, 775 N.W.2d at 676. See, also, *Gibb v. Citicorp Mortgage, Inc.,* 246 Neb. 355, 518 N.W.2d 910 (1994) (as between vendor and purchaser, where material facts and information are equally accessible to both, and nothing is said or done which tends to impose on purchaser or to mislead him or her, failure of vendor to disclose such facts does not amount to actionable fraud). Under the totality of circumstances, a finder of fact could conclude that Schechinger justifiably relied on the false misrepresentation that the skid loader had 206 hours of actual use. And, it is clear that Schechinger suffered damage as a result in that he purchased a skid loader of less value than he understood it to possess.

Schechinger pled and offered sufficient evidence to state a claim for fraudulent misrepresentation by Swain's employee. See *Knights of Columbus Council 3152 v. KFS BD, Inc.*, 280 Neb. 904, 791 N.W.2d 317 (2010) (elements of fraudulent misrepresentation). Swain does not contend that it cannot be liable for its employee's actions or inactions by reason of the employee having lacked authority related to the sale of the skid loader. Our analysis would be incomplete, however, without determining if the employee's fraudulent misrepresentation could bind Swain.

Generally, whether an agency relationship exists presents a factual question. *Koricic v. Beverly Enters. - Neb.*, 278 Neb. 713, 773 N.W.2d 145 (2009). The scope of an agent's authority also is a question of fact. *Id.* An agent is a person authorized by the principal to act on the principal's behalf and under the principal's control. See *id.* For an agency relationship to arise, the principal manifests assent to the agent that the agent will act on the principal's behalf and subject to the principal's control. *Id.* And the agent manifests assent or otherwise consents so to act. *Id.* An agency relationship may be implied from the words and conduct of the parties and the circumstances of the case evidencing an intention to create the relationship irrespective of the words and terminology used by the parties to characterize or describe their relationship. *Koricic v. Beverly Enters. - Neb., supra*.

Actual authority is authority that the principal expressly grants to the agent or authority to which the principal consents. *RM Campbell Indus. v. Midwest Renewable Energy*, 294 Neb. 326, 886 N.W.2d 240 (2016). A subcategory of actual authority is implied authority, which courts typically use to denote actual authority either to (1) do what is necessary to accomplish the agent's express responsibilities or (2) act in a manner that the agent reasonably believes the principal wishes the agent to act, in light of the principal's objectives and manifestations. *Id.* When a

principal delegates authority to an agent to accomplish a task without specific directions, the grant of authority includes the agent's ability to exercise his or her discretion and make reasonable determinations concerning the details of how the agent will exercise that authority. *Id.*

A principal may be liable for the fraudulent actions of its agent. See *Gibb v. Citicorp Mortgage, Inc., supra*. Under common-law principles, a principal is liable for the deceit of its agent committed in the very business he or she was appointed to carry out; this is true even though the agent's specific conduct was carried on without knowledge of the principal. See *Draemel v. Rufenacht, Bromagen & Hertz, Inc.*, 223 Neb. 645, 392 N.W.2d 759 (1986).

The evidence does not include the terms of employment between Swain and its employee who dealt with Schechinger for the sale of the skid loader. According to Armstrong, that employee worked for Swain as its "contact person"; Armstrong also indicated that the employee was one of Swain's "shop people." Under the agreement between Swain and the company which hosted the online auction, Armstrong, on behalf of Swain, named that same employee as the person to contact at Swain. The description of the skid loader on Schechinger's invoice listed the employee as the "Seller's Contact" next to what appears to be the telephone number at which to reach Swain; the same telephone number was attributed to Swain's business address and the employee's name. All of Schechinger's direct dealings with Swain contained in the record were through that same employee. Armstrong testified that Schechinger talked to the employee "because we [(Swain)] had to show him which skid loader he was interested in."

The evidence indicates that the employee was tasked with communicating with the online auction company and potential bidders for Swain's auction items, including the skid loader eventually purchased by Schechinger. The employee also had authority to show the skid loader to interested bidders. Thus, the employee had the actual authority to communicate with and show the skid loader to Schechinger prior to the auction. The record supports that in exercising that authority, the employee could answer Schechinger's questions about the skid loader. A finder of fact could find that it was reasonable for the employee to do so to secure actual bidders for the skid loader and a profitable sale of the item for the benefit of Swain. In absence of specific directions, the employee was able to exercise his discretion in determining how best to answer Schechinger's questions about the skid loader. See *RM Campbell Indus. v. Midwest Renewable Energy, supra*. Swain could be liable for the employee's fraudulent misrepresentation committed while acting in the scope of his actual and implied authority to act for Swain. See *Draemel v. Rufenacht, Bromagen & Hertz, Inc., supra*. Swain's knowledge of the employee's specific communication with Schechinger that created the fraudulent impression about the skid loader's actual hours of use is irrelevant to the liability created out of the principal-agent relationship. *Id.*

Upon our consideration of the judgment in the light most favorable to Schechinger, we conclude that the small claims court must have relied on parol evidence in light of its relevance to Schechinger's claim of fraudulent misrepresentation, which claim is supported by competent evidence in the record. As illustrated in our analysis, parol evidence of the prior oral assurances by Swain's employee which created a false impression that the skid loader had only 206 hours of actual use was necessary to resolve Schechinger's claim. See *Central Constr. Co. v. Osbahr,* 186 Neb. 1, 180 N.W.2d 139 (1970) (fraud cannot be determined by mere inspection of written document; parol evidence is always admissible to show that execution of written instrument was

procured by fraud, or that, by reason of fraud, it does not express true intentions of parties). Accordingly, we reject Swain's assertion that the small claims court should have disregarded evidence of statements made prior to the sale in light of the disclaimer under the terms for the sale. Our review of the judgment for errors appearing on the record reveals none.

CALCULATION OF DAMAGES

Swain contends, alternatively, that "[a]ssuming Schechinger's action is legally viable, his calculation of hours was in error." Brief for appellant at 12. Since the small claims court relied upon Schechinger's calculations, Swain argues that the small claims court erred in its determination of damages.

Damages, like any other element of the plaintiff's case, must be pled and proved, and the burden is on the plaintiff to offer evidence sufficient to prove the plaintiff's alleged damages. See *Pan v. IOC Realty Specialist*, 301 Neb. 256, 918 N.W.2d 273 (2018). Evidence of damages must be sufficient to enable the trier of fact to estimate actual damages with a reasonable degree of certainty and exactness. *Id.* Proof of damages to a mathematical certainty is not required; however, a plaintiff's burden of offering evidence sufficient to prove damages cannot be sustained by evidence which is speculative and conjectural. *Id.* The opinion of a personal property owner is competent evidence of its value, solely because of his or her status as owner. See *id.*

Schechinger's claim was that his skid loader had about 1,550 hours of actual use rather than 206 hours. During the hearing before the small claims court, it was Schechinger's position that the skid loader had 1,343 additional hours of use (1,549 less 206 hours). As stated previously, the service records show that in 2010, the skid loader went from having 1,343 hours on its hour meter to "000" hours after its "instrument cluster" was replaced. Thereafter, the hours increased steadily. Schechinger's evidence was that the employee told him the skid loader had 206 actual hours on it as of February 2019. Schechinger's position was each additional hour of use devalued the skid loader by $2. Schechinger opined that the rate at $2 per hour was "pretty lenient" and "really cheap"; he took into account that the skid loader was an "older machine." It is apparent that the small claims court relied upon Schechinger's testimony to reach its judgment amount of $2,686 (1,343 additional hours of use multiplied by $2 of value per hour).

Swain contends the skid loader had less hours of additional use than 1,343 hours based on its interpretation of the service records that the hour meter was replaced not only in 2010, but also in 2006. Under its interpretation, Swain contends Schechinger's damages should have been lower, specifically, that the additional hours on the equipment only totaled 467 hours, not 1,343 hours. Swain argues that in April 2005, the hour meter was at 235 hours, but that in February 2006, work done on the skid loader included the following: "Switched brain from another skid loader. Serviced." Swain claims that at that time "[a]n hour meter from another skid loader was inserted that began at 1,102 hours." Brief for appellant at 13. From that point, the skid loader was used for another 232 hours, resulting in an hour meter reading of 1,343 hours. A new meter was subsequently "inserted that started as 0," *id.*, and the skid loader was then used for 206 hours, as reflected on the meter at the time of sale.

Swain argues that the 2006 service, referring to switching a "brain," means that a used hour meter showing 1,102 hours was installed into Schechinger's skid loader at that time such that those

- 11 -

hours cannot be attributed to the actual use hours of Schechinger's skid loader. However, the small claims court had this evidence before it and elected to not adopt Swain's interpretation of the service records. Rather, the small claims court evidently relied on Schechinger's claimed number of the additional hours, which is supported by a different interpretation of the service records. The amount of the judgment entered by the small claims court is supported by competent evidence and is neither arbitrary, capricious, nor unreasonable.

## CONCLUSION

The order of the district court affirming the judgment of the small claims court is affirmed.

AFFIRMED.